FILED
2004 JUL 12 AM 3:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| RITA L. EDWARDS, individually and as Personal Representative for the Estate of Ricky Bernard Edwards, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF FLORENCE, ALABAMA, an Alabama Municipal Corporation, et al.,<br><br>    Defendants. | }<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br><br>ENTERED<br>JUL 1 2 2004<br><br>Case No.: CV 01-P-2480-NW |

## MEMORANDUM OPINION

The court has before it Defendants' Motion for Summary Judgment. (Doc. #18). The motion has been fully briefed and the court has advised the parties that as of December 23, 2003, the motion was under submission, without oral argument. (Doc. # 33). Plaintiff Rita L. Edwards, individually and as Personal Representative for the Estate of Ricky Bernard Edwards, deceased, commenced this action by filing a complaint on October 2, 2001. (Doc. # 1). The complaint asserts the following claims: (1) violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments under 42 U.S.C. §1983; (2) conspiracy to interfere with civil rights under 42 U.S.C. §1985; and (3) state law claims for "neglect to prevent" and wrongful death under Ala Code § 6-4-410.[1]

For the reasons outlined below, Defendants' Motion for Summary Judgment is due to be granted as it relates to the Plaintiff's claims under 42 U.S.C. §1983 and 42 U.S.C. §1985 because there are no disputed issues of material fact and Defendants have demonstrated that they are entitled

---

[1] Defendants' summary judgment motion does not seek dismissal of Plaintiff's state law claims.

to judgment as a matter of law. As to the remaining state law claims, the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3), and therefore, those claims will be dismissed without prejudice.

I.      **Legal Standards for Evaluating a Summary Judgment Motion**

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

II.     **Relevant Undisputed Facts**[2]

On October 2, 1999, Defendant Jacob Pugh, a patrol officer with the City of Florence Police Department, was on routine patrol. (Doc. # 19, Ex. 3). At approximately 3:08 a.m., he observed a black Buick Skylark automobile being driven erratically southbound on Pine Street in Florence, Alabama. (*Id.*) Officer Pugh then activated his emergency blue lights and siren in an effort to stop the vehicle. (*Id.*) The vehicle did not stop and instead increased its speed, running two stop signs and narrowly avoiding two head-on collisions. (*Id.*)

---

[2] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The City of Florence has a written "pursuit" policy authorizing officers to pursue suspects in cases involving "hazardous violations that present a continuing danger to other road users." (Doc. # 19, Ex. 5-A). In accordance with the policy, Officer Pugh pursued the suspect vehicle to the Carver Heights Housing project on Mobile Street in Florence, Alabama. (Doc. # 19, Ex. 3). The driver of the vehicle pulled the vehicle behind a residence at 1439 Carver Heights and abandoned the vehicle. (*Id.*) The suspect then ran into a wooded area behind the residence and Officer Pugh pursued the suspect on foot. (*Id.*) Although he was unable to see the suspect, he followed the noise of his "running" footsteps for approximately fifty yards until he heard a loud splash and what sounded like a person trying to swim. (*Id.*) Officer Pugh remained in the woods trying to determine if the suspect had gotten out of the water, but heard nothing. (*Id.*) He never saw or touched the suspect, but instead stayed in the wooded area continuing to assess the situation and communicating with the police department dispatcher until Emergency Management Agency (EMA) personnel arrived. (*Id.*; Doc. # 24, Ex. 2). Throughout the vehicle pursuit and foot chase, Officer Pugh was unable to see the suspect and was unaware of the suspect's identity. (Doc. # 19, Ex. 3). In fact, Officer Pugh initially thought the suspect was female. (Doc. # 24, Ex. 2).

Shortly afterwards, Defendant Rick Singleton, the Police Chief of the City of Florence Police Department, was informed of a possible drowning and requested that the Alabama Bureau of Investigation conduct an independent investigation. (Doc. # 19, Exs. 5, 6). At approximately 5:00 a.m. that morning, Defendant Randy England, a lieutenant with the Florence Police Department, was assigned to oversee water search efforts at the location where the suspect reportedly entered the water near the Cypress Creek Bridge, off Savannah Highway in Florence. (Doc. # 19, Ex. 4).

Because the water in the creek was polluted and toxic to divers (who typically have to undergo hepatitis treatment upon diving in this particular body of water), the officers were hesitant to endanger the divers if the suspect in fact had fled elsewhere. (Doc. # 24, Ex. 3, at 35; Doc. # 24, Ex. 5, at 27-37). Therefore, Deputy Chief Tony Logan sent Officer Dupreen Roberts to contact the family of the suspect -- now identified as Ricky Bernard Edwards -- to rule out the possibility that Mr. Edwards was "hiding in a family member's house, you know, laughing at us." (Doc. # 24, Ex. 3, at 35). At that point, the officers were primarily concerned with Mr. Edwards' safety, not with arresting him or pursuing charges against him. (Doc. # 24, Ex. 5, at 36-37; Ex. 3, at 35-36).[3]

Divers entered the water at approximately 8:20 a.m. (Doc. # 24, Ex. 4). Officer England assisted with the search of both banks of Cypress Creek in the area, although he found no indication that the suspect had exited the water on either bank. (Doc. # 19, Ex. 4). Later that day, at approximately 2:00 p.m., a dive team located the body of an African American male subsequently identified as Plaintiff's decedent, Ricky Bernard Edwards, on the bottom of the creek. (*Id.*) Under the direction of the Alabama Bureau of Investigation, the body was pulled to the surface. (*Id.*)

---

[3] Although Plaintiff's brief alleges that Logan was dispatched to find Ms. Edwards to make a seemingly sinister, albeit unexplained "offer" (Doc. # 24, at 2), an examination of the evidence cited by Plaintiff reveals that the circumstances were benign and the officers were focused on the safety of Mr. Edwards. Plaintiff asked England about the "offer" and he explained that they intended to "just tell him that we're not going to come after him [] -- At that point, we just wanted to know if he was safe." (Doc. # 24, Ex. 3, at 8-39). Logan testified accordingly:

| | |
|---|---|
| Question: | As far as being cited for any driving offenses or anything, was this some kind of offer of amnesty or something that's just what you were told? The focus was not any charges but the focus was just safety? |
| Answer: | My focus -- when I went to speak with his mother, my focus was to make sure that Mr. Edwards' was safe. |

(Doc. # 24, Ex. 5, at 36).

4

On October 4, 1999, an autopsy was performed on the body of Mr. Edwards by Dr. Stephen Pustilnick, who concluded that Mr. Edwards' death was caused by drowning. (Doc. # 19, Ex. 7-B, Attachment 2). Dr. Pustilnick found no evidence of any foul play. (Doc. # 19, Ex. 7-B, Attachment 2).

On or about October 8, 1999, Plaintiff Rita Edwards authorized a second autopsy by her expert, Dr. Steven Hayne. (Doc. # 19, Ex. 8, at 13, Attachment 8).[4] Ms. Edwards specifically requested an "extensive and thorough investigation of the back and neck area...." (Doc. # 19, Ex. 8-E). Dr. Hayne concluded that Edwards' died of a fresh water drowning, and he found no evidence of foul play. (Doc. # 19, Ex. 8, at pp.17, 20, 41-42, 46, 75-78).

On March 24, 2001, Edwards' body was exhumed and examined again by Dr. Michael West and a second time by Dr. Hayne. (Doc. # 19, Ex. 7-C, at Attachment 3). No evidence of foul play was discovered by either Dr. Hayne or Dr. West. (Doc. # 19, Ex. 8, at p.66, 75-78; Ex. 9, at 39-40). Dr. West identified abrasions with a "tram appearance . . . . usually associated with a cylindrical object - a flashlight, a baton, a pool stick." (Doc. # 19, Ex. 8, at p. 57-58). Dr. West did not assert

---

[4] Although Plaintiff's opposition to summary judgment asserts that Dr. Hayne's autopsy "was delayed by the actions of the City of Florence and State of Alabama," there is no evidence in the record to support this claim. The only citation provided for this statement is "excerpts from Dr. Hayne's deposition." (Doc. # 24, at 3 n.7). The court has independently examined Dr. Hayne's deposition and finds that, in fact, Dr. Hayne stated that the medical examiner's initial autopsy *did not impair or impede* his ability to assess the body. (Doc. # 24, Ex. 7, at p. 37-38). The record reveals that Dr. Hayne examined the body a mere *four* days after the medical examiner. (Doc. # 19, Ex. 8, at 13, Attachment 8). Although Dr. Hayne does mention a delay in *exhuming* the body so that he could examine it for the second time, he only attributes that delay to "a question of public health or public safety in exhuming the body," not to any deliberate or malicious delay by the City or State. (Doc. # 24, Ex. 7, at p. 43). Although Plaintiff's counsel apparently believes the City and State's actions "delayed" Dr. Hayne's *second* chance to examine the body, there is no evidence to support that assertion. Therefore, such a wholly unsupported statement by Plaintiff's lawyer "cuts no ice at all." *Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 586, 588 (7th Cir. 1992) (Posner, J.).

that any of the injuries were caused by Defendants, and he explained that those abrasions may be suggestive of "a rotation of the body as its going down" a 30 to 40 foot steep embankment. (Doc. # 19, Ex. 8, at p. 41, 58).

### III. Applicable Substantive Law and Discussion

#### A. 42 U.S.C. § 1983

Based on the events of October 2, 1999, Plaintiff asserts claims against the individual Defendants and the City of Florence, alleging under §1983 that Defendants deprived Mr. Edwards of his constitutional rights to his life and civil liberties. (Doc. # 1, "Count One"). Plaintiff bases his §1983 claim on deprivation of rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. For several reasons, Plaintiff's argument is flawed and summary judgment is due to be granted on all of Plaintiff's § 1983 claims.

##### 1. Summary Judgment Is Appropriate as to the City of Florence

Summary judgment is due to be granted as to all claims against Defendant City of Florence. When a local government is the subject of liability under §1983, the plaintiff must show that "the constitutional deprivation resulted from a custom, policy, or practice of the municipality." *Wideman v. Shallowford Comm. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). Plaintiff has offered no evidence that the City of Florence had any custom, policy, or practice which caused the alleged constitutional violations. As outlined in more detail in Section III.A.3, *infra,* there is no evidence to support Plaintiff's theory that Mr. Edwards was beaten and thrown in the lake, much less that any such conduct was the product of an unconstitutional city policy. In fact, the evidence demonstrates that Officer Pugh was, in fact,

operating in accordance with police policy in pursuing Mr. Edwards. (Doc. # 19, Ex. 5-A).[5] Although the outcome of the pursuit was certainly unfortunate and untimely, the undisputed evidence shows that it was unintentional. Therefore, because no policy, custom, or practice led to Mr. Edwards' death, the City of Florence cannot be held liable under §1983.

### 2. Plaintiff's Fifth and Sixth Amendment Claims Fail as a Matter of Law

Summary judgment is due to be granted as to Plaintiff's §1983 claims under the Fifth and Sixth Amendments claim because those rights are not implicated in this case. The Fifth Amendment applies only to the federal government, not to state and local governments. *Dowdell v. Chapman*, 930 F.Supp. 533, 542 (M.D. Ala. 1996); *Knoetze v. United States Dep't of State*, 634 F.2d 207, 211 (5th Cir. 1981).[6] Because this case involves only local actors and a municipality, summary judgment as to this claim is due to be granted.

Additionally, summary judgment is appropriate as to Plaintiff's §1983 claim under the Sixth Amendment. The Sixth Amendment states, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him;

---

[5] In the event that Plaintiff means to assert that the City of Florence's police pursuit policy is the policy which led to Mr. Edwards' death, this allegation is foreclosed by the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), discussed *infra*. *Lewis* held that police pursuits are not by themselves violative of the Constitution, even if they result in injury, as long as there was no *intent to injure*. *Lewis*, 523 U.S. at 854. Thus, the City of Florence's policy alone is not enough to sustain a claim under § 1983.

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions of the Fifth Circuit handed down before close of business on September 30, 1981 are binding precedent on the Eleventh Circuit).

7

to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const., Amend VI. Although Plaintiff claims that Mr. Edwards was denied his rights "to be informed of the nature and cause of the accusation, an impartial jury, to confront witnesses and assistance of counsel," (Doc. # 1, at ¶ 18(c)), those rights were never triggered because Plaintiff was not part of a "criminal prosecution." He was never apprehended, arrested, taken into custody, or even identified before his demise. (Doc. # 19, Ex. 3). Accordingly, summary judgment is appropriate on this claim.

      3.    **Plaintiff Has Failed to Establish a Cognizable Claim as to the § 1983 Claims Alleging Deprivations of Rights Secured by the Fourth and Fourteenth Amendments**

In order to prevail on Plaintiff's §1983 claims that Mr. Edwards was deprived of his "right to be secure in his person from warrantless seizure and without probable cause" under the Fourth Amendment and "equal protection of laws and due process prior to being deprived of life or liberty" under the Fourteenth Amendment, Plaintiff must demonstrate a cognizable deprivation of these Constitutional rights. 42 U.S.C. § 1983. [7] The Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998), is dispositive on the question of whether a cognizable § 1983 claim under the Fourth and Fourteenth Amendments can arise out of a police pursuit which results in harm to the suspect.

---

[7] Specifically with respect to Plaintiff's claim under the Fourth Amendment, the court finds that Plaintiff has failed to fully develop any argument regarding these alleged violations. With the exception of briefly stating the allegations in her Complaint and making a very terse, elusive argument in her Brief in Opposition to Defendants' Motion for Summary Judgment, Plaintiff nowhere else expands upon her theory that the pursuit of a suspect who has openly violated traffic rules and fled the scene constitutes an illegal search and seizure. Nonetheless, the court will address this claim because it is present in Plaintiff's pleadings.

As to claims under the Fourth Amendment, the court in *Lewis* concluded that a high speed police chase intended to apprehend a suspect is not a "seizure" within the meaning of the Fourth Amendment and thus cannot give rise to a cognizable claim. *Lewis*, 523 U.S. at 844-45 (collecting cases standing for the same premise). In the earlier case of *California v. Hodari D.*, 499 U.S. 621, (1991), the Court explained that "neither usage nor common-law tradition makes an attempted seizure a seizure." *Hodari D.*, 499 U.S. at 626, n. 2. In this case the undisputed facts indicate that Officer Pugh never saw or touched the suspect, much less actually "seized" him. (Doc. # 19, Ex. 3). Summary judgment is appropriate on this claim.

*Lewis* is also instructive with regard to Plaintiff's § 1983 claim under the Fourteenth Amendment. The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Lewis*, 523, U.S. at 854. Plaintiff argues that an "intent to injure" existed in this case and offers the following allegations as evidence thereof: (1) "a female's voice on tape indicating that she witnesses the Florence Police Officers push a man, presumably [Mr. Edwards], off the cliff into Cypress Creek;" (2) Randy England's desire to make an "offer" to Mr. Edwards' family; (3) Dr. West identifying possible "foul play" injuries. (Doc. # 24, at 3-4). None of these are sufficient to create a disputed fact as to whether or not Defendants possessed the requisite intent to injure.

With respect to the first allegation regarding a female voice, Plaintiff has not presented any evidence, other than inadmissible hearsay, to support this allegation and it is therefore not

9

appropriately considered in the court's summary judgment analysis.[8] Fed. R. Civ. P. 56(e); Fed. R. Evid. 801(c); *see also Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999) ("Inadmissible hearsay generally cannot be considered on a motion for summary judgment."). Second, Plaintiff's mischaracterization of any "offer" is not only insufficient to create a disputed fact, but it is an inaccurate characterization of what the evidence reveals actually occurred, as discussed by the court in footnote 2 *supra*. Finally, although Plaintiff asserts that Dr. West identified possible foul play injuries, a reading of Dr. West's deposition reveals only that he found some injuries and bruising that could have been caused by Mr. Edwards rolling down a steep embankment, or could be "suggestive" of injuries inflicted by a "billy stick." (Doc. # 24, at Ex. 8, at 61). The court finds that Dr. West's theories are at best inconclusive, at worst targeted conjecture, and in any event not enough to create

---

[8] Although Plaintiff's opposition brief suggests that "radio logs and 911 tapes reveal a call from an apparent white female who appears to have witness [sic] an event at Cypress Creek that morning and ask the question why did they push that man into the creek," (Doc. # 24, at 2), the *only* "evidence" cited for this assertion is a letter from counsel for Defendants which states,

> I am writing to to follow up with you on issues you raised after the depositions . . . . the female voice on the tape who makes statements regarding someone being pushed off the bluff is Glinda Abernathy, who is a telecommunicator with the Florence/Lauderdale Emergency Management Communication District. Ms. Abernathy has stated that she made the comment "in a joking manner" and that she "did not intend to accuse anyone of wrong doing."

(Doc. # 24, Ex. 6). This third-hand account of what was apparently a hoax is inadmissible hearsay, and regardless, it does not create a genuine issue of material fact as to whether the Defendants are responsible for Mr. Edwards' death. Likewise, Plaintiff's assertion that "[t]here were other witnesses who claimed to have witnessed foul play, but were afraid to come forward," (Doc. # 24, at 3), is also based on inadmissible hearsay and in fact, inaccurate. The only "witness" mentioned in the evidence cited for the above statement is a person named Lamont Cole, who allegedly told Plaintiff Rita Edwards that "'I saw from my house when he got beat up and dropped him over there in the creek.'" (Doc. # 24, Ex. 9, at 113-121). Plaintiff's testimony does not include any statement that Cole, or any other witness for that matter, is afraid to come forward. This unsubstantiated hearsay is not properly considered by the court on summary judgment. Fed. R. Civ. P. 56.

an inference of intent to injure.

What the undisputed facts do indicate is that Mr. Edwards' body has undergone two autopsies in addition to being exhumed and inspected by experts hired by the Plaintiff. No expert or examiner found any evidence of foul play nor levied any assertion of misconduct on the part of the Defendants. (Doc. # 19, Exs. 7-B, 7-C, 8-E, 8). Both examiners who conducted autopsies concluded that the cause of death was drowning. (Doc. # 19, Exs. 7-B, 8). Although Dr. Hayne found some unexplained injuries, he found no evidence of choking or internal bleeding and he formed no opinion with any degree of medical certainty regarding the cause of the injuries. (Doc. # 19, Ex. 9, at 24, 31-32, 75-80). Officer Pugh, the only officer involved in the pursuit, stated, under oath, that he never saw nor touched Mr. Edwards. (Doc. # 19, Ex. 3).

In order to survive a summary judgment motion, the Plaintiff must present evidence to support her claim that a constitutional deprivation occurred. The undisputed evidence in this case reveals only that Ricky Edwards drowned and that any other injuries he sustained are unexplained; therefore, summary judgment is due to be granted.[9]

---

[9] For many of the same reasons, Plaintiff also has failed to demonstrate a causal connection between the alleged act or omission of the Defendants and the alleged constitutional deprivation. *See Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) ("[§1983] plainly requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation") (internal quotations omitted). As to Defendants Singleton and England, there is no dispute that their involvement occurred after the pursuit was over and the suspect had disappeared. This post-alleged deprivation involvement simply does not constitute the kind of participation in the constitutional violation necessary for §1983 liability. Although Officer Pugh pursued the suspect by both vehicle and foot, there is no evidence that he ever saw or identified the suspect, much less touched him or caused him to enter the water. Plaintiff's assertions that the police officers beat Mr. Edwards and/or threw him in the water are unsupported by any of the autopsy reports or the expert testimony. Plaintiff's own examiners found no evidence of foul play and, although they identified some abrasions on the body, even Plaintiff's expert admitted that those contusions could easily have been caused by the body rolling down a very steep 30-40 feet embankment that led to the water below. There is simply no evidence in the

**B.     42 U.S.C. § 1985**

Plaintiff's complaint asserts a claim under § 1985(3) for conspiracy to deprive Mr. Edwards of his life "as protected by the equal protection clause of the Fourteenth Amendment to the U.S. Constitution." (Doc. # 1, "Count Two").[10] "Unlike a claim under §1983, which does not need to assert a specific intent to deprive another of a federal right, a claim under §1985(3) must allege a class-based, invidiously discriminatory purpose behind the defendants' action." *Burrell v. Board of Trustees of Ga. Military College*, 970 F.2d 785, 793 (11th Cir. 1992). The elements of a §1985(3) action are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983). The Supreme Court has held that, in order to state a claim under §1985(3), a Plaintiff must demonstrate, under the second element, "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Scott*, 463 U.S. at 829; *see also Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627-28 (11th Cir.1992).

Therefore, unlike § 1983 actions, public officials are not subject to liability under §1985(3) unless their actions were motivated by discriminatory animus. As the Eleventh Circuit recognized,

---

summary judgment record to suggest that any acts of the police officers involved caused Mr. Edwards' demise.

[10] Although Plaintiff's complaint does not specify that her § 1985 claim falls under subsection (3) of the Act, (*see* Doc. # 1, "Count Two"), the substance of her claim – deprivation of Mr. Edwards' life – can only be construed as a claim under § 1985(3) for "depriving persons of rights or privileges." 42 U.S.C. § 1985(3).

12

"[t]his narrow intent requirement erects a significant hurdle for §1985(3) plaintiffs. Section 1985(3) actions often stand or fall on the plaintiff's ability to establish the specific type of discriminatory animus behind the conspirators' actions." *Burrell*, 970 F.2d at 794.

In this case, the complaint is devoid of *any* allegation of racial animus; the allegations under § 1985 state only that Defendants conspired "to deprive Ricky of his life as protected by the equal protection clause of the Fourteenth Amendment to the U.S. Constitution . . . . Such acts were done wantonly, willfully, and with reckless disregard for plaintiff's and Ricky's well being." (Doc. # 1, "Count Two"). Moreover, the summary judgment record contains no evidence establishing the race of any of the individual Defendants, much less evidence suggesting they possessed the requisite racial animus.[11] Finally, Jacob Pugh, the only officer involved in the car chase and present on the scene prior to prior to the drowning and recovery efforts, has stated that he did not know the identity of the driver of the car until Mr. Edwards' body was recovered. (Doc. # 19, Ex. 3). There is no allegation or evidence of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Scott*, 463 U.S. at 829. The court finds that the Plaintiff has failed to establish the requisite intent necessary under §1985(3) and therefore, this claim fails as a matter of law.

### IV.   Conclusion

For the reasons stated above, Defendants' motion for summary judgment is due to be granted as it relates to the Plaintiff's claims under 42 U.S.C. §1983 and 42 U.S.C. §1985. The court finds that no genuine issues of material fact remain for trial as to those claims and that Defendants are

---

[11] Although the autopsy report does identify the decedent's race as African American, this appears to be the only reference to race in the summary judgment record. (Doc. # 19, Ex. 7B).

entitled to judgment as a matter of law. As to the remaining state law claims, the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3); accordingly, those claims are due to be dismissed, without prejudice. A separate order will be entered.

**DONE** and **ORDERED** this _12-th_ day of July, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE